IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCIS P. O'KEEFE | : | CIVIL ACTION |
| | : | |
| v. | : | No. 12-3486 |
| | : | |
| CAROLYN W. COLVIN,[1] | : | |
| Acting Commissioner of Social Security | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                               **July 20, 2015**

  Plaintiff Francis O'Keefe seeks review of the denial of his application for Disability Insurance Benefits by the Commissioner of Social Security. O'Keefe has filed objections to the United States Magistrate Judge's Report and Recommendation (Report) recommending his request for review be denied. The Court will sustain O'Keefe's objection that the Administrative Law Judge (ALJ) erred in holding his mental impairment did not meet the standard of severity in step two of the five-step sequential evaluation process used to determine if an individual is disabled. Accordingly, O'Keefe's request for review will be granted, and this case will be remanded to the Commissioner for further review consistent with this Memorandum.

**BACKGROUND**

  **1. Procedural Background**

  O'Keefe filed his disability application on September 15, 2008, alleging disability since September 1, 1997. After his application was initially denied, a hearing was held before an ALJ on March 8, 2010, at O'Keefe's request. In a decision issued on August 27, 2010, the ALJ applied the five-step sequential evaluation process for determining whether an individual is

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rule of Civil Procedure 25(d), Colvin is substituted for Michael J. Astrue as the Defendant in this case.

disabled[2] and concluded O'Keefe had not been under a disability since September 15, 2008, the date O'Keefe filed his application. The ALJ found at step two of the analysis that O'Keefe's obesity was a severe impairment and that his hypertension and fatty liver disease, when combined, were also severe impairments. The ALJ also concluded, however, that O'Keefe's affective disorder was best described as depression, NOS (not otherwise specified), and was nonsevere.[3] At step three, the ALJ found that O'Keefe's hypertension and fatty liver disease did

---

[2] The Social Security Act defines disability as inability to engage in substantial gainful activity by reason of a medically-determinable physical or mental impairment, "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1); *see also Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). A claimant is considered unable to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

     The Social Security Administration (SSA) has established a five-step sequential evaluation process to determine whether an individual is disabled. *See* 20 C.F.R. § 416.920(a). First, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If so, the claimant is not disabled. Second, the Commissioner must determine whether the claimant has a severe, medically determinable physical or mental impairment. If the answer to this question is "no," the claimant is not disabled. At the third step, the Commissioner must determine whether the claimant's severe impairment meets or is medically equivalent to an impairment listed in Appendix I to Subpart P of 20 C.F.R. Part 404. If so, the claimant is disabled. If not, the Commissioner must assess the claimant's residual functional capacity to determine, at the fourth step, whether the claimant can perform her past relevant work. If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step. At the fifth step, the ALJ must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If he is not able to do other work and meets the duration requirement, he is disabled. *See, e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001) (describing the five-step sequential evaluation process).

[3] The ALJ also found at this step that O'Keefe did not have a severe headache impairment or severe vertigo.

not meet or equal any listed impairment.[4] At steps four and five, the ALJ concluded O'Keefe had the residual functional capacity to perform a range of medium work and had no past relevant work; the ALJ also found a significant number of jobs exist in in the national economy that O'Keefe could find. O'Keefe requested review of the ALJ's decision by the Appeals Council, but the Council denied his request. O'Keefe thereafter filed the instant action.

## 2. Medical History Background

Dr. Haresh Punjabi performed a consultative examination on O'Keefe for the Bureau of Disability Determination on March 5, 2009. R. 245-50. Dr. Punjabi noted that O'Keefe was neurologically alert and oriented and scored perfect on a brief mental exam, referred to as a mini-mental exam. *Id.* On March 19, 2009, state psychiatrist Dr. Anthony Galdieri, PhD, conducted a state agency review and completed a standard Psychiatric Review Technique Form,[5] marking O'Keefe's disorder as memory/concentration problems and analyzing the symptoms under Listing 12.02 for Organic Mental Disorders.[6] R. 251-63. Dr. Galdieri concluded that O'Keefe's statements about his health were partially credible, he was alert, and his attention/concentration was intact. He found O'Keefe had no limitations with regard to activities of daily living or social

---

[4] The ALJ noted that there has been no listing for obesity since October 1999, but he considered O'Keefe's obesity in the residual functional capacity assessment at steps four and five.

[5] When a disability is based on a mental condition, SSA prepares a Psychiatric Review Technique Form as part of the claim evaluation. A doctor working for SSA uses the form to indicate whether the basic requirements for disability are met.

[6] The SSA maintains a listing of impairments that it considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. Mental disorders are listed in section 12.00. Dr. Galdieri evaluated O'Keefe's possible impairment as an organic mental disorder, Listing 12.02, which is described as "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain." *Id.* Listing 12.02. The ALJ believed that O'Keefe's mental impairment was better described as an affective disorder, which is found in Listing 12.04 and is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." *Id.* Listing 12.04.

functioning, and he had experienced no episodes of decompensation of extended duration. R. 261. He did find, however, that O'Keefe had mild difficulty in maintaining concentration, persistence, or pace. *Id.* On March 20, 2009, Marie A. Geffert evaluated O'Keefe via a Physical Residual Functional Capacity Assessment.[7] Geffert stated that the findings in her assessment differ from the opinions expressed by Dr. Punjabi because the evidence provided by Dr. Punjabi "reveals only a snapshot of the claimant's functioning and is an underestimate of the severity of his limitations," and therefore, "great weight cannot be given to [Dr. Punjabi's] findings." R. 269. She concluded that O'Keefe suffered from a medically determinable impairment of obesity/fatty liver and hypertension. *Id.* She noted, however, "the overall evidence suggests he has the ability to care for himself and maintain his home," and "[a]lthough the claimant alleges significant limitations, the field office personnel observed him to have no difficulties while at the field office." *Id.*

A few months later, O'Keefe began treatment at the New Life Center on May 14, 2009.[8] The record contains a New Life Treatment Plan dated September 3, 2009, indicating O'Keefe

---

[7] Geffert is listed as the adjudicator on the report performed by Dr. Punjabi, *see* R. 245. Because she signed the last page of the Physical Residual Functional Capacity Assessment, *id.* at 270, the Court assumes Geffert completed the Physical Residual Functional Capacity Assessment.

[8] The ALJ questioned when O'Keefe actually began treatment at the New Life Center. A therapist from New Life wrote an undated "To Whom It May Concern" letter stating O'Keefe had been in treatment with his therapist on a biweekly basis since May 14, 2009, and had met with a psychiatrist three times, the first time on November 11, 2009. R. 353. This letter appears to have been faxed from New Life with two other Progress Notes on February 23, 2010. *Id.* In addition, New Life Treatment Plans dated September 2009 and December 2009 note the date of admission to New Life as May 14, 2009. R. 341, 344. The ALJ references the letter, but points out the first documented New Life treatment note offered into evidence is an evaluation by Dr. Kaganovich, a psychiatrist, dated November 11, 2009, almost six months after O'Keefe allegedly began treatment. R. 25-26. Given the letter and notations on the treatment plans, the Court finds O'Keefe began treatment in May 2009, even if he did not meet with a psychiatrist until November 2009.

had an Axis I[9] diagnosis of bipolar affective disorder, NOS, an Axis II diagnosis of narcissistic personality disorder, and a global assessment of functioning (GAF) score of 50.[10] R. 344. The Plan states that O'Keefe had depression, low energy levels, lack of motivation, and pessimistic thinking about the future. [11] *Id.* On October 15, 2009, therapist Katherine Dukenski completed a New Life Progress Notes Form, stating that O'Keefe had five sessions since his September 3, 2009, Treatment Plan, was exhibiting no changes since his last session, was depressed with low energy levels, and had difficulty focusing on one topic. R. 342.

Dr. Michael Kaganovich, a psychiatrist for New Life, interviewed O'Keefe on November 11, 2009, and completed a Comprehensive Biopsychosocial Evaluation (CBE). R. 335-40. Dr. Kaganovich listed O'Keefe's Axis I diagnosis as bipolar affective disorder, NOS, and recorded

---

[9] The American Psychiatric Association (APA) publishes the Diagnostic and Statistical Manual of Mental Disorders (DSM), which offers standard criteria for the classification of mental disorders in the medical field. The fourth edition, the DSM-IV, organized each psychiatric diagnosis into five dimensions (axes) relating to different aspects of disorder or disability. The first axis (Axis I) incorporated psychological diagnostic categories like depression, anxiety, or bipolar. The second axis (Axis II) covered personality disorders and intellectual disabilities like schizoid personality disorder or obsessive-compulsive disorder. The American Psychiatric Association eliminated this multiaxial system in the fifth and latest edition of the DSM.

[10] A GAF score is a "numerical summary of a clinician's judgment of [an] individual's overall level of functioning." *Rivera v. Astrue*, 9 F. Supp. 3d 495, 504 (E.D. Pa. 2014) (alterations in original) (quoting APA: DSM 32 (4th ed. 2000) (hereinafter DSM-IV-TR)). The GAF score ranges from zero to one hundred and assesses a person's psychological, social, and occupational function. *See Lozado v. Barnhart*, 331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004).

A GAF score in the range of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood;" a GAF score in the range of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job);" a GAF score in the range of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers)." *Id.* (quoting DSM-IV-TR 32).

[11] This report is unsigned but the ALJ indicated it was completed by a therapist. R. 25.

O'Keefe's GAF score as 40/45 (representing "past/present"), *see* R. 340, which is lower than the GAF score recorded in the New Life Treatment Plan dated September 3, 2009. Dr. Kaganovich also stated that O'Keefe had suicidal ideation, depression, and anxiety. R. 335-37. On December 23, 2009, Dr. Kaganovich completed a Psychiatric Medication Note stating O'Keefe was in partial remission, had periods of suicidal ideation, and reported not taking his medication; Dr. Kaganovich, however, also checked "no" on the form for suicidal and homicidal ideation and plans, seemingly contradicting his statement on the form just above the checklist that O'Keefe had periods of suicidal ideation. R. 352.

The record contains a second New Life Treatment Plan dated December 10, 2009, recording the same information as the September Treatment Plan but adding that O'Keefe expressed "passive suicide ideation." R. 341. On January 20, 2010, and February 2, 2010, therapist Dukenski completed New Life Progress Notes, describing O'Keefe as severely depressed with low energy level. R. 355, 354.

**DISCUSSION**

Under 28 U.S.C. § 636(b)(1), this Court reviews de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Review of a final decision of the Commissioner of Social Security is limited, however, to determining whether the decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence requires "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (citations omitted). Evidence is substantial if it does "more than create a suspicion of the existence of the fact to be established. . . . [I]t must

be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (citation omitted). If the ALJ's decision is supported by substantial evidence, the district court is bound by the ALJ's findings, even if it "would have decided the factual inquiry differently." *Fargnoli*, 247 F.3d at 38.

In his request for review, O'Keefe argues the ALJ's decision was not supported by substantial evidence because the ALJ (1) violated Third Circuit precedent and agency policy in finding that O'Keefe's mental impairments were not severe at step two of the evaluation; (2) did not properly analyze the expected duration of O'Keefe's mental impairments; (3) failed to properly develop the record regarding the decline in O'Keefe's psychiatric condition; (4) erred in not crediting O'Keefe's statements about his limitation and misstated O'Keefe's ability to perform activities of daily living; and (5) failed to include any of O'Keefe's established mental limitations in the residual functional capacity finding. In his objections, O'Keefe references all of these arguments, but mainly challenges the ALJ's finding at step two that his mental disorder was not severe.

   1. **Challenges to the Step Two Analysis**

O'Keefe challenges the ALJ's finding at step two of the five-step analysis that his mental impairment could not be considered severe for purposes of disability benefits. O'Keefe asserts that impairment severity is a "de minimis" inquiry and an impairment must be found severe if it imposes anything more than a minimal effect on claimant's ability to work. He argues the ALJ failed to properly assess and weigh the material health evidence, and the ALJ did not properly analyze the expected duration of O'Keefe's mental impairments despite evidence that his medical condition steadily declined after he entered a formal mental health center. The Court

agrees and finds the ALJ did not use the appropriate standard when finding O'Keefe's mental impairment was not severe.

"The burden placed on an applicant at step two is not an exacting one," and "an applicant need only demonstrate something beyond 'a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.'" *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (citing Soc. Sec. Admin. Program Policy Statement, SSR 85-28, 1985 WL 56856, at *3 (1985)); *see also Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003) ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue."). Further, "[a]ny doubt as to whether this showing has been made is to be resolved in favor of the applicant." *McCrea*, 370 F.3d at 360 (citing *Newell*, 347 F.3d at 546-47).

In making his decision as to disability, the ALJ does not have discretion to reject a medical expert's opinion simply because he disagrees with the physician's interpretation of the claimant's medical evidence, and he cannot "supplant[] the opinions of [the claimant's] treating and examining physicians with his personal observation and speculation." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). The ALJ must give the opinions of a claimant's treating physician "substantial and at times even controlling weight." *See Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 202 (3d Cir. 2008) (citation omitted). If rejecting a treating physician's opinion outright, he may only do so "on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citations and internal quotation marks omitted). In other words, the ALJ may not substitute his lay opinion for

the medical opinion of a treating physician, especially in cases involving mental disabilities. *See Id.* at 319; *Rivera v. Astrue*, 9 F. Supp. 3d 495, 502 (E.D. Pa. 2014).

If an ALJ believes that the submitted reports are conclusory or unclear, it is "incumbent upon the ALJ to secure additional evidence from another physician." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *see also Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986) ("[A]n ALJ is not free to set his own expertise against that of a physician who presents competent evidence."). According to SSA policies, the ALJ "must obtain an updated medical opinion from a medical expert" when additional medical evidence is received that "may change the State Agency's medical or psychological consultant's findings." SSR 96-6p, 1996 WL 374180, at *3-4 (July 2, 1996); *Morales*, 225 F.3d at 319-20; *accord* 20 C.F.R. § 416.912(e) (stating that an ALJ may ask claimant to attend a consultative exam if evidence from claimant's own medical sources are insufficient or nonexistent); 20 C.F.R. § 404.1517 (explaining if a claimant's medical sources cannot or will not provide sufficient medical evidence about claimant's impairment, an ALJ may ask the claimant to have one or more physical or mental examinations).

In his decision at step two that O'Keefe's mental impairment was not severe, the ALJ essentially rejected the diagnosis and analysis of O'Keefe's treating psychiatrist, Dr. Kaganovich, and state psychiatrist, Dr. Galdieri, and improperly substituted his own lay opinion. The ALJ relied on Dr. Kaganovich's statement on December 23, 2009, after six weeks of treatment, that O'Keefe was in partial remission even though O'Keefe reported not taking his medication. R. 352. The ALJ pointed out the inconsistency on this treatment note referenced above, as Dr. Kaganovich wrote that O'Keefe had periods of suicidal ideation but underneath, checked "No" for suicidal ideation and plan. R. 352. The ALJ stated that if O'Keefe actually did

9

have suicidal or homicidal intent and plan, Dr. Kaganovich would have recommended hospitalization, but he never did. Further, the ALJ noted that while O'Keefe had some mood disturbance, he maintained good eye contact during his mental examination, his affect was appropriate, his memory was intact, his thought processes were goal directed, and his insight and judgment were fair. In his finding, the ALJ also relied on O'Keefe's testimony that he had one or two friends and shopped independently. Using this evidence, the ALJ disagreed that O'Keefe's impairment was the type found in Listing 12.02, as indicated by Dr. Galdieri, or that O'Keefe had bipolar disorder, as indicated by Dr. Kaganovich. Instead the ALJ determined that O'Keefe's disorder was best described as depression, a Listing 12.04 impairment.[12]

To justify his deviation from the psychiatrists, the ALJ noted Dr. Galdieri, the state psychiatrist, did not have any mental health treatment notes from New Life (because none existed at the time of Dr. Galdieri's examination) and could only rely on the mini-mental status examination performed by Dr. Punjabi. The ALJ further stated that even though the Axis I diagnosis at New Life was bipolar affective disorder, NOS, "the available information from New Life does not entirely comport with the clinical requirements for a bipolar disorder." R. 26. The ALJ also pointed out that Dr. Kaganovich labeled his diagnosis as a bipolar *affective* disorder, NOS, and the inclusion of "affective" supported the ALJ's finding O'Keefe did indeed suffer from an affective disorder, but one of depression.

Armed with his new diagnosis of depression, the ALJ then proceeded through the Psychiatric Review Technique Form analysis for a Listing 12.04 impairment. Listing 12.04 states

---

[12] As previously explained, Listing 12.02 describes organic mental disorders which are "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.02. Listing 12.04, on the other hand, describes affective disorders, which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." *Id.* Listing 12.04.

"[t]he required level of severity for these disorders is met when the requirements in both [parts] A and B are satisfied, or when the requirements in [part] C are satisfied," and before any of the criteria found in Part C is relevant, the individual must have a medically documented history of an affective disorder of at least two years' duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Part A lists several symptoms of the impairment, and Part B lists the functional limitations resulting from the impairment.[13] The ALJ focused on the limitations listed in Part B, and found that O'Keefe had no more than mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and O'Keefe had not had any episodes of decompensation. The ALJ concluded that O'Keefe therefore did not meet any of the criteria in Part B, and, because O'Keefe has not been in treatment or diagnosed with any mental impairment of at least two years, the criteria of Part C was not relevant.

The ALJ therefore essentially diagnosed O'Keefe with depression even when the psychiatrists who examined either him or his medical file determined O'Keefe's symptoms were the result of either an organic mental disorder or bipolar disorder. While O'Keefe's impairment may be better described under Listing 12.04 or as depression, the ALJ was not at liberty to conduct his own analysis and reach his own medical judgment. Further, Dr. Punjabi's and Dr. Galdieri's reports were rendered before O'Keefe began treatment at New Life, and the ALJ should have at least obtained an updated analysis from the state agency or asked a medical expert to testify at the hearing as to the severity of any possible affective disorder before concluding that O'Keefe's doctors were incorrect when they reviewed O'Keefe for a Listing 12.02 impairment and/or bipolar disorder.

---

[13] These limitations include marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation, each of an extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.02.

Because the ALJ improperly substituted his own medical judgment and did not collect any additional medical evidence regarding O'Keefe's potential affective disorder, the Court will vacate the ALJ's decision. On remand, the ALJ should collect further evidence about a possible Listing 12.04 affective disorder before concluding O'Keefe's mental impairment does not meet the severity requirement of step two.[14]

---

[14] The only evidence a district court may consider in assessing whether substantial evidence supports the ALJ's decision is the administrative record at the time of the ALJ's decision and not any additional evidence the claimant may have supplied to the Appeals Council in his request for review. *See Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001) (holding "evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence" and "[n]o statutory authority (the source of the district court's review) authorizes the court to review the Appeals Council decision to deny review [or] authorizes the district court to make a decision on the substantial evidence standard based on the new and material evidence never presented to the ALJ"). Instead, the district court can remand the case to the Commissioner to consider any new evidence presented to the Appeals Council or otherwise, "but only if the claimant has shown good cause why such new and material evidence was not presented to the ALJ." *Id.*; *see* 42 U.S.C. § 405(g). The evidence must be new and not merely cumulative of what is already in the record and it must be material, meaning relevant and probative. *See Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). "An implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id.*

During his appeal to the Appeals Council, O'Keefe provided additional information not presented to the ALJ. This additional evidence was a New Life prescription log and psychiatric medication notes dated November 2009 through May 2011, R. 356-63; treatment records from Northeastern Ambulatory Care Center and Temple University Hospital dated October 2010 and July 2011, R. 364-69; a New Life prescription log, Comprehensive Biopsychosocial Re-Evaluation, and psychiatric medication notes dated May 2011 through November 2011, R. 370-79; and a medical source statement from Katherine Dukensi, M.A., dated November 8, 2010, R. 380-83

O'Keefe's hearing in front of the ALJ took place on March 8, 2010, and the ALJ issued his decision in this case on August 27, 2010. Thus, at the time of his hearing many of these new documents did not exist and could not have possibly factored into the ALJ's decision about O'Keefe's disability between September 15, 2008 (when he applied for disability benefits) and August 27, 2010 (when the ALJ issued his decision). As for the few records that do fall in that time period, namely the psychiatric medication notes dated December 2009, February 2010, and April 2010, R. 360-62, the Court finds this evidence is not material and O'Keefe has not provided good cause why he did not submit this evidence initially. The ALJ need not consider this additional evidence when reviewing his decision in accordance with this Memorandum.

**2. Other Challenges**

O'Keefe asserts other challenges in his brief that he referenced in his objections. He challenges the ALJ's credibility analysis, asserting the ALJ ignored O'Keefe's statements about his limitations and misstated O'Keefe's ability to perform activities of daily living. He also asserts the ALJ did not properly analyze the expected duration of O'Keefe's mental impairments and argues the ALJ's residual functional capacity finding was defective because it failed to include all limitations, including those from his mental impairments, which are required to be considered even if the impairment is not severe. After the ALJ reconsiders his findings at step two regarding the severity of O'Keefe's mental impairment, the ALJ should use his more informed step two conclusion when assessing the duration of O'Keefe's mental impairment and performing the credibility and functional capacity analyses.

**3. Subsequent Application**

Lastly, O'Keefe argues the Court should consider the fact that after the denial of benefits in this case, the Commissioner subsequently granted him benefits pursuant to an application he filed on September 15, 2010, a few weeks after the adverse decision in this case. In that later decision, an ALJ found at step two that O'Keefe suffered from the following severe impairments: obsessional compulsive disorder, major depressive disorder with psychotic features, panic disorder with agoraphobia, generalized anxiety disorder, and alcohol dependence sustained full remission. *See* Pl.'s Br. and Statement of Issues in Supp. of Req. for Rev. Ex. A, at 8. The ALJ concluded that O'Keefe had been disabled from September 15, 2010, through August 10, 2012, the date of the decision, and awarded benefits.

This subsequent finding, however, is immaterial to the issue presented in this case. First, the only evidence that may be considered in assessing whether substantial evidence supports the

ALJ's decision is the administrative record at the time of the ALJ's decision. *See Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). The decision finding O'Keefe had severe impairments occurred after the ALJ's decision in this case. Second, the issue in this case is whether substantial evidence supports the ALJ's decision that O'Keefe was not disabled on or before August 27, 2010, the date of the ALJ's decision, whereas the subsequent decision concerned the period of time after August 27, 2010. *See Jackson v. Astrue*, 402 F. App'x 717, 718 (3d Cir. 2010) ("Standing alone, the fact that the Commissioner subsequently found claimant to be disabled does not warrant remand or reversal in the absence of new and material evidence . . . ."). The later decision is therefore irrelevant.

      An appropriate order follows.

BY THE COURT:

 /s/ Juan R. Sánchez           
Juan R. Sánchez, J.